# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| | ) | **2: 16 - MJ - 0187    KJN** |
| SATISH KARTAN | ) | |
| SHARMISTHA BARAI | ) | |
| *Defendant(s)* | | |

**FILED**

OCT 21 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of ___San Joaquin___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Offenses Against the United States, to wit: Forced Labor in violation of 18 U.S.C. Section 1589(a), Fraud in Foreign Labor Contracting in violation of 18 U.S.C. Section 1351(a); and violations of the Fair Labor Standards Act in violation of 29 U.S.C. Sections 206(a)(1)(C), (f)(1), 215(a)(2) and 216(a). |
| 18 U.S.C. § 1589(a) | Forced Labor |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
Complainant's signature

MARC T. BEESON, SPECIAL AGENT
Printed name and title

Sworn to before me and signed in my presence.

Date: Oct 21, 2016    10:25 A.M.

_____
Judge's signature

City and state:    Sacramento, CA

Kendall J. Newman, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT
## (FIRST AMENDED)

I, Special Agent (SA) Marc T. Beeson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Department of Homeland Security ("DHS"),
Homeland Security Investigations ("HSI"), and have been since January 2002. Before I became a Special Agent, I attended the Immigration Officers Basic Training Course, in Glynco, GA, in 1992, and completed a two week Customs Cross Designated Training Course in 2004, after Legacy INS and Legacy Customs merged to form ICE. I am familiar with investigations related to narcotics, child pornography, money laundering, immigration fraud, human trafficking, and other violations of state and federal laws. While conducting these types of investigations, I have written reports of investigation; interviewed hundreds of suspects; written, served and participated in the execution of dozens of search/arrest and seizure warrants; conducted physical surveillance; arrested hundreds of violators, and obtained and analyzed telephone tolls, pen register data, public source records, official immigration documents, financial records, notes, ledgers, and pay/owe sheets ("trick books" and "tally sheets").

2.      Over the course of my career, I have participated in and/or planned over 100 operations that included physical and electronic surveillance. I have also interviewed confidential sources, confidential witnesses, and defendants regarding various criminal activities, to include but not limited to narcotics, money laundering, immigration fraud, and human trafficking. I have arrested dozens of people involved in violations of Titles 8, 18, and 21 of the United States Code. I have written reports and analyzed records and documents in conjunction with the preparation of affidavits requesting authorization for the execution of search and arrest

1

warrants and I have authored, planned, and executed dozens of said warrants. I have gained

knowledge in the use of various investigative techniques, including the utilization of physical

surveillance, undercover agents, confidential sources, confidential witnesses, controlled

purchases of illegal contraband, electronic surveillance, consensual monitored recordings,

investigative interviews, trash and mail covers, financial investigations, the service of grand jury

subpoenas, and the execution of federal search and arrest warrants. I have been involved in the

execution of state and federal search and arrest warrants related to narcotics, money laundering,

immigration fraud, child pornography, human trafficking, and other violations. As a result, I

have encountered and become familiar with the various tools, methods, trends, paraphernalia,

and related articles used by drug dealers, document vendors, human traffickers, child predators,

and others, in their efforts to import, conceal, abuse, and victimize people for their own personal

gain.

## PURPOSE OF AFFIDAVIT

3. This affidavit is submitted in support of, and to establish probable cause for, the

issuance of a criminal complaint and arrest warrants for Satish KARTAN ("KARTAN") and

Sharmistha BARAI ("BARAI") for violations of Title 18, United States Code, Section 371,

conspiracy to commit offenses against the United States, to wit: Title 18, United States Code,

Section 1589(a) (forced labor); Title 18, United States Code, Section 1351(a) (fraud in foreign

labor contracting); and Title 29, United States Code, Sections 206(a)(1)(C), (f)(1), 215(a)(2), and

216(a) (violations of the Fair Labor Standards Act); and violations of Title 18, United States

Code, Section 1589(a) (forced labor).

4. The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

2

to show merely that there is sufficient probable cause for the requested criminal complaint and warrants and does not set forth all of my knowledge about this matter.

## **STATUTORY AUTHORITY**

5.    Title 18, United States Code, Section 371 makes it a crime for two or more persons to conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, where one or more of such persons does any act to effect the object of the conspiracy.

6.    Title 18, United States Code, Section 1589(a) prohibits, in relevant part, any person from knowingly providing or obtaining the labor or services of a person by any one, or combination of, the following means:  by means of force, threats of force, physical restraint, or threats of physical restraint; by means of serious harm or threats of serious harm; by means of the abuse or threatened abuse of law or legal process; or by means of any scheme, plan or pattern intended to cause a person to believe that if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.  The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.  The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

3

7. Title 18, United States Code, Section 1351(a) makes it a crime for one to knowingly, and with intent to defraud, recruit, solicit, or hire a person outside the United States or cause another person to recruit, solicit, or hire a person outside the United States, or attempt to do so, for purposes of employment in the United States by means of materially false or fraudulent pretenses, representations or promises regarding that employment.

8. Title 29, United States Code, Sections 206(a)(1)(C), (f)(1), 215(a)(2), and 216(a) prohibit paying any person, employed in domestic service for more than eight hours in the aggregate in any workweek, less than the federal minimum wage of $7.25 per hour. Section 216(a) provides that "[a]ny person who willfully violates any of the provisions of section 215 of this title shall upon conviction thereof be subject to a fine of not more than $10,000, or to imprisonment for not more than six months, or both. No person shall be imprisoned under this subsection except for an offense committed after the conviction of such person for a prior offense under this subsection."

## FACTS ESTABLISHING PROBABLE CAUSE

### The First Victim

9. In January 2016, a 51-year-old Indian female ("PERSON ONE") contacted the Stockton Police Department ("SPD") and reported that she had been coerced into working domestic chores for weeks without pay in the residence of an Indian couple living in Stockton, California. According to PERSON ONE,[1] she entered the United States with a B-2 visa as a visitor for pleasure, and intended to stay for three months. Based on my training and experience, I know that people who enter on B-2 visas for pleasure are not authorized to be employed or to be compensated in any way for employment. According to PERSON ONE, she was originally

---

[1] Unless otherwise indicated, the facts about PERSON ONE's time spent at the KARTAN residence set forth in paragraphs 9 through 19 are taken from PERSON ONE's statements to law enforcement personnel.

4

sponsored[2] in India by Aruna Kartan, an old friend of PERSON ONE's deceased mother. Aruna Kartan told PERSON ONE that she could stay with her son, Satish KARTAN, who resided in the United States.

10.     After entering the United States on January 8, 2016, PERSON ONE took a taxi from the Sacramento Airport to KARTAN's residence at 6541 Brook Hollow Circle in Stockton, California (the "KARTAN residence").

11.     Upon arriving at the KARTAN residence, she was told to wash dishes, which she did for 15 minutes. She went to bed at 2:30 a.m., and was told to wake up at 5:30 a.m. After taking a shower, PERSON ONE was told by KARTAN that she had to feed an approximately three-year-old child who resided in the home, make juice, and do other household chores.

12.     PERSON ONE began working on household chores at the KARTAN residence. She usually went to bed at 1:30 a.m. and would wake up at 5:30 a.m. KARTAN and his wife, BARAI, would usually wake up between 11:00 a.m. and 1:00 p.m., and would go to bed around 2:30 a.m. During the hours they were awake, KARTAN and BARAI would periodically check on PERSON ONE to ensure she was working.

13.     In the beginning, when she first arrived at the KARTAN residence, PERSON ONE said that she was not permitted to eat because she never had time. When she was making food for the family, PERSON ONE was not allowed to eat the food she made because that would make KARTAN and BARAI angry. KARTAN and BARAI fought often and, in PERSON ONE's opinion, they would take out their anger on PERSON ONE.

---

[2] Based on my training, experience, and discussion with other law enforcement agents, I know that a sponsor is someone who writes a letter of financial responsibility to assist a foreign national in getting a visa to enter the United States. While a sponsor letter is not always required, it often helps someone obtain a visa who might not otherwise be eligible.

14.     KARTAN and BARAI rarely left the house, but when they did go out they would take their child with them.  They would always leave PERSON ONE with a list of chores to complete while they were gone.  PERSON ONE would never eat or sleep while the family was gone for fear they would be angry with her.  Oftentimes, KARTAN and BARAI verbally abused PERSON ONE when her list of chores was not complete.  On one occasion, BARAI told PERSON ONE that PERSON ONE was not working fast enough and if she did not do a better job with the chores, BARAI was going to throw hot water on PERSON ONE.

15.     For the 14 days she remained at the KARTAN residence, PERSON ONE ate rice once per day and drank coffee that she brought with her, or water.  One time when she drank some juice, BARAI became angry and told PERSON ONE there would not be enough for her (BARAI) to drink.

16.     During her stay at the KARTAN residence, PERSON ONE never left the house and spoke to only one person on the telephone: her husband.  Since PERSON ONE's cellphone died shortly after her arrival, KARTAN allowed PERSON ONE to make one phone call a day to her husband and limited the call to two minutes.  KARTAN would stand next to PERSON ONE and listen to the entire conversation.

17.     On the last night PERSON ONE stayed at the KARTAN residence, she spoke to her husband, with KARTAN nearby.  PERSON ONE spoke to her husband in a different language, hoping that KARTAN would not understand what was being said.  PERSON ONE's husband told her to leave the residence because it was too dangerous to remain.  Once the conversation was over, KARTAN told PERSON ONE that if she left, he would follow her and she would not be able to go anywhere in this country.  KARTAN also told PERSON ONE that

6

she owed him approximately $2,500 if she wanted to leave.  That night, KARTAN slept by the front door to prevent PERSON ONE from leaving.

18.     The next morning, PERSON ONE told KARTAN she was leaving.  He told her she did not have anywhere to go and threatened to have her visa cancelled if she left.

19.     On January 22, 2016, PERSON ONE left the KARTAN residence and took a taxi to the Stockton Police Department, where she filed a police report.  PERSON ONE initially provided law enforcement personnel with false information about her own name, the names of KARTAN and BARAI, and about her purpose for travelling to the United States.  She later admitted to making these false statements, and told police the real names of KARTAN and BARAI, which law enforcement then corroborated through its review of records.

20.     On January 27, 2016, the SPD Vice Unit contacted me about this matter.  Once I received the information, I conducted a public database query and confirmed that KARTAN and BARAI were the individuals living at 6541 Brook Hollow Circle.  I then conducted law enforcement database queries and verified that PERSON ONE had arrived in the United States on January 8, 2016, as she claimed.

21.     According to the SPD Report, PERSON ONE had family in Ohio.  I contacted PERSON ONE's sister, who currently resides in Westerville, Ohio.  PERSON ONE's sister stated that PERSON ONE was currently staying with her in Ohio and was destined to return to India on January 30, 2016.

22.     PERSON ONE was unwilling to return to California to contact KARTAN and BARAI, but agreed to make a consensually monitored phone call to KARTAN from Ohio.  HSI SA Greg Dalga provided PERSON ONE with a recording device and had her contact KARTAN. PERSON ONE used the ruse that she was still in Stockton, California, had run out of money, and

needed his help to return to India.  During their conversation, which was conducted in English,

KARTAN made the following statements:[3]

> A. "I told you it was going to be 6 a.m. to midnight.  Right?  There was nothing new, we didn't do anything that we didn't tell you about."
>
> B. ". . . no, no you making you make the same mistake six days in a row.  Huh?  You make the same mistake six days in a row.  Same thing that madam has been . . . same thing told you for like six times every night she's telling you to do this and you don't do it."
>
> C. ". . . see, I know how to deport . . . I, I can report you."
>
> D. "You want me to deport you, say what you want."

23.     Shortly afterward, KARTAN hung up.  During a subsequent consensually

monitored conversation between KARTAN and PERSON ONE, KARTAN denied any

wrongdoing.

24.     On January 30, 2016, PERSON ONE departed the United States and returned to

India.  PERSON ONE stated that she was never compensated at any time for her domestic labor

during her stay at the KARTAN residence.

25.     On October 13, 2016, I spoke to PERSON ONE and her husband by telephone

while they were in India.  PERSON ONE's husband contradicted many portions of PERSON

ONE's earlier statement to Stockton police dated January 22, 2016.  However, PERSON ONE

did reiterate that BARAI threatened to throw hot water on her if PERSON ONE did not work

faster.

///

---

[3] I reviewed the recording of the conversation and transcribed these statements to the best of my ability.

## The Second Victim

26.     On August 31, 2016, SPD received a phone call from KARTAN's and BARAI's

neighbor after an Indian female ("PERSON TWO") contacted the neighbor and asked for

assistance.  PERSON TWO told SPD officers that she was being abused by a male inside a home

next door, and told SPD officers that she had shown the neighbor how she was physically struck,

using hand gestures.[4]  SPD Officer Harpreet Shoker arrived on scene to help translate but does

not speak PERSON TWO's Indian dialect of Telugu.  Officer Shoker was able to make out some

of what PERSON TWO was saying, which was that "Satish" had taken her money and burned

her hands on the stove.

27.     Later that evening, HSI SA Analisa Nogales and I, along with a Stanislaus County

Victim Witness Advocate, took PERSON TWO to the San Joaquin General Hospital to have her

medical condition evaluated.  According to the emergency room doctor, PERSON TWO was

slightly dehydrated and had burns on her hands that were several days old.

28.     On September 1, 2016, SA Nogales and I interviewed PERSON TWO at the HSI

Sacramento Office using a certified Telugu interpreter.  PERSON TWO stated that while in

India, she had paid someone named "Satish" (last name unknown)[5] approximately 325,000

rupees (approximately $4,885 U.S. Dollars) to get her a visa to come to the United States.  After

receiving her visa, "Satish" and another person named "Rao" (last name unknown) told

PERSON TWO about an advertisement in the "Eenadu," a local Indian newspaper, seeking a

nanny.  After PERSON TWO expressed her interest, "Satish" gave PERSON TWO's telephone

---

[4] Unless otherwise indicated, the facts about PERSON TWO's time spent at the KARTAN residence set forth in
paragraphs 26 through 40 are taken from PERSON TWO's statements to law enforcement personnel.

[5] Based on the investigation to date, I presently believe that this individual referred to as "Satish" is not Satish
KARTAN.

number to KARTAN. During a subsequent telephone conversation between KARTAN and

PERSON TWO, KARTAN told her that he needed someone to care for his baby and that he

would pay her 100,000 rupees per month (approximately $1,400 U.S. dollars). KARTAN did

not tell PERSON TWO over the phone about the amount of hours he expected her to work.

KARTAN paid for PERSON TWO's airplane ticket to the United States.

29.    PERSON TWO stated that when she arrived at the Hyderabad Airport in India,

she was met by "Satish" and "Rao." They photographed PERSON TWO and sent her picture to

KARTAN, who paid them 100,000 rupees for brokering the deal. PERSON TWO then boarded

the airplane and flew to London, then to Chicago, and then to California. PERSON TWO stated

she landed in California, but did not know the name of the city, which was San Francisco

according to her plane ticket.

30.    Once in San Francisco, PERSON TWO went outside the terminal where a taxicab

driver approached her and asked if she was PERSON TWO. When she nodded yes, the driver

handed her his cell phone and KARTAN, who was on the phone line, told her to take the taxi to

his house. She stated the drive took about one-and-a-half hours. Once the taxi arrived at the

KARTAN residence, KARTAN arrived in another vehicle immediately afterward. PERSON

TWO told SA Nogales and I that she believed KARTAN had followed her all the way from the

airport, and questioned why he did not just pick her up himself.

31.    PERSON TWO arrived at the KARTAN residence at approximately 1:30 a.m. At

5:30 a.m. that same morning, an alarm clock woke her up. KARTAN and BARAI made

PERSON TWO clean the house for the next several days while KARTAN followed her around

and made sure she was doing what she was told. One day, PERSON TWO told KARTAN and

BARAI that PERSON TWO needed more sleep, and so they let her set the alarm clock for 5:50

10

a.m.; however, BARAI was waiting outside her door at 5:50 a.m. and made sure PERSON TWO immediately went downstairs. For her first ten days at the KARTAN residence, PERSON TWO stayed in the nursery, which did not have a lock on the door. After ten days, PERSON TWO moved to another room that did have a lock on the door. One day, PERSON TWO was feeling sick, so she locked her bedroom door. KARTAN and BARAI told PERSON TWO that she was not ever allowed to lock the door again. On another occasion, BARAI entered PERSON TWO's room without permission and woke her up early because BARAI had to attend a baby shower and said that she (PERSON TWO) had a lot of work to do before the shower began.

32.     PERSON TWO said she was only able to communicate with KARTAN, in Telugu. BARAI does not speak Telugu, but sometimes used KARTAN to translate. One time, BARAI hit PERSON TWO in the mouth because, according to PERSON TWO, BARAI thought PERSON TWO was talking back to her. PERSON TWO said she was blamed for everything, even when she did nothing wrong. For example, if KARTAN and BARAI's child fell down while walking around, BARAI would blame PERSON TWO. BARAI would often talk to PERSON TWO in a raised voice. PERSON TWO understood a few common words that BARAI would use when referring to PERSON TWO, like "stupid."

33.     KARTAN and BARAI told PERSON TWO that she was not allowed to touch the baby with cold hands, so PERSON TWO would usually warm her hands up on the gas stove in the kitchen. One day BARAI saw her warming her hands over the stove and got mad because BARAI did not think her hands were close enough to the flame to make them warm. PERSON TWO demonstrated that her hands were usually about twelve inches above the stove. The Saturday or Sunday before she left the KARTAN residence, PERSON TWO was warming her hands over the stove when KARTAN snuck up behind her and grabbed her hands. KARTAN

pushed her hands from about twelve inches above the flame to about one inch from the stove itself, into the flames. PERSON TWO immediately pulled her hands away from the stove; however, her hands were burned by the flames. PERSON TWO stated that while KARTAN did not say anything, he made a face indicating he knew she had been burned. KARTAN and BARAI did not give her ice for the burn. PERSON TWO claimed that after this incident, she lost feeling in her fingers.

34.     Every day during her stay at the KARTAN residence, PERSON TWO was required to make approximately five pounds of chicken or fish into soup. She would boil the chicken or fish in crock pots, and while the food was still hot, PERSON TWO would have to debone it and then use mesh strainers to turn the chicken or fish into mush or soup. She asked if she could use a blender or grinder and was told no, and that she had to puree it with the strainers provided. PERSON TWO asked if they would buy some new strainers because the partially torn ones were cutting her hands. She was again told no, and that the strainers she was using were sufficient. PERSON TWO was also not allowed to wear gloves during this process because KARTAN and BARAI claimed the gloves might tear and get into the food, and so PERSON TWO had to handle the hot chicken with her bare hands. PERSON TWO further stated that she also had to add spices in the chicken and fish, which caused more pain to her burned and cracked hands.

35.     If PERSON TWO did not do what KARTAN and BARAI asked, they both would hit her on the shoulders using their hands. KARTAN and BARAI would also talk to PERSON TWO in a vulgar way and make fun of her. Sometimes KARTAN would clap his hands right in front of her face to get her to do what he wanted. On one occasion, BARAI hit PERSON TWO in the face after PERSON TWO told her family in India that she was not being treated well.

36.     PERSON TWO was only allowed to talk to her family in India for two minutes each week, usually on Saturday night (Sunday morning in India), using one of KARTAN's two cell phones. Once the two minutes were up, KARTAN would grab the phone and hang it up.

37.     At one point during her stay, PERSON TWO gave KARTAN some money so that he would buy her a cell phone. KARTAN took her money, but neither purchased the phone nor gave her the money back.

38.     PERSON TWO stated that KARTAN and BARAI held her at the house against her will. PERSON TWO was not able to leave because they kept all three entries/exits locked. PERSON TWO believed the front door was dead-bolted from the outside, while the side gate was locked using a combination lock. PERSON TWO did not know how to open the third exit, which was the garage. At one point during her stay, PERSON TWO asked them to let her go, but they would not do so. PERSON TWO finally left the house when KARTAN opened the side gate to take out the trash and forgot to relock the gate. Shortly after taking the out trash, KARTAN, BARAI, and their daughter left the house, at which time PERSON TWO went to the neighbors' house and asked for help.

39.     I asked PERSON TWO what she normally ate for breakfast. She responded that she would sometimes get to eat leftover rice with corn, but that sometimes she did not get to eat breakfast. Sometimes PERSON TWO would "steal" a few grapes or cashews and put them in her mouth surreptitiously so that KARTAN and BARAI would not see. PERSON TWO was afraid she might get in trouble if they saw her eat food other than exactly what they allowed her to eat. PERSON TWO also believed that KARTAN and BARAI had cameras in the house to watch what she (PERSON TWO) was doing, even when they were not around.

13

40.     PERSON TWO stated that KARTAN and BARAI began verbally abusing her on the first day she was there by calling her a "bitch."  They began physically abusing PERSON TWO about a week later.

41.     During the course of this investigation, I have reviewed medical records from two medical examinations of PERSON TWO, conducted on or about August 31 and September 8, 2016, which diagnosed PERSON TWO with, and provided discharge instructions for the treatment of, burns to PERSON TWO's hands; the discharge instructions from the August 31st examination also included those for a contusion and adult dehydration.

## The Third Victim

42.     On September 7, 2016, law enforcement observed an approximately 50-year-old female ("PERSON THREE") standing in the driveway of the KARTAN residence.  PERSON THREE was observed getting into a vehicle, which agents followed until a traffic stop could be conducted.  During the traffic stop, law enforcement was able to obtain the residence address of PERSON THREE.  Agents were subsequently able to locate and communicate with PERSON THREE at the address provided during the traffic stop.

43.     PERSON THREE confirmed that she worked at the KARTAN residence for four days but was not paid for her work. [6]  PERSON THREE said she was told there would only be a husband, wife, and one child at the residence, but when she arrived there was another man and two children.

44.     PERSON THREE stated that she grew up in Kathmandu, Nepal, and completed schooling up to the tenth/eleventh grade.  She has a daughter who lives in Arizona and two sons.

---

[6] Unless otherwise indicated, the facts about PERSON THREE's time spent at the KARTAN residence set forth in paragraphs 43 through 60 are taken from PERSON THREE's statements to law enforcement personnel.

One son lives in San Francisco and the other son lives in Nepal. She was a housewife while raising her family in Nepal. Her husband passed away a few years ago. PERSON THREE came to the United States to work so she could send money to her son in Nepal.

45.     PERSON THREE was living in Sunnyvale, California, and was looking for work. PERSON THREE has a green card, which allows her to find employment. She called various people she knew in an effort to secure a job. She was placed in contact with a Nepalese male named "SHAM," who had a friend who needed someone to work for him.

46.     PERSON THREE does not know where SHAM lives but indicated it was far from California. PERSON THREE also spoke with SHAM's sister, "LATA," who resides in Los Angeles, California, about the job prospect with KARTAN. PERSON THREE knows LATA from her village in Nepal. PERSON THREE spoke with SHAM and asked him if KARTAN is a good person. SHAM said KARTAN is a nice person and that he will not harass her. SHAM told PERSON THREE that he spoke with KARTAN about the type of work and the working conditions. SHAM assured PERSON THREE that he will speak with KARTAN and tell him that PERSON THREE should go to bed by 10:00 or 11:00 p.m. PERSON THREE spoke with KARTAN over the phone about the job and told him that she would work for three to four days to see if she liked it.

47.     PERSON THREE started working for KARTAN on either September 4 or 5, 2016. KARTAN called PERSON THREE and made arrangements to pick her up between 7:00 – 7:30 p.m. that same day. PERSON THREE was staying with a Nepalese family in San Jose at the time. When she arrived at the KARTAN residence, the house was dirty and everything was scattered about. She also noticed there were two males and one child. She became very nervous when she saw how much stuff was lying around. She tried to get things organized for the next

15

morning and finally went to sleep around 12:00 a.m. KARTAN told her she had to wake up at 5:00 a.m. the next morning.

48.     The alarm clock in PERSON THREE's room was set for 4:30 a.m. If she was not up by 5:00 a.m, KARTAN knocked on her door until she woke up. PERSON THREE locked the bedroom door from the inside so KARTAN had to knock. The alarm clock was red and was located on a table near the bed. KARTAN would come downstairs between 7:00 a.m. and 8:00 a.m., and his wife came downstairs around 12:00 p.m. When KARTAN came downstairs, he would tell PERSON THREE that she was working too slow and would ask her what was taking her so long. PERSON THREE was not allowed to go to bed until 12:30 a.m. or 1:00 a.m. These long hours made PERSON THREE sick and gave her a headache. KARTAN kept her busy all the time and did not allow her to take a break to drink tea or eat any food. PERSON THREE told him she was getting sick, but he would not allow her to rest.

49.     PERSON THREE kept possession of her cellular phone. Anytime she tried to call someone, KARTAN would ask, "What are you doing?" PERSON THREE feared that KARTAN would physically assault her.

50.     PERSON THREE said she could no longer work for him and offered to have someone replace her, but KARTAN did not allow her to call anyone. PERSON THREE was nervous he would hurt her.

51.     PERSON THREE expected to be paid $2,000 a month to care for KARTAN's child. She was told that KARTAN and BARAI would be working at their office during the day. After PERSON THREE arrived at the house, she was told to clean the dishes, mop the floors, cook, clean, do the laundry and vacuum. KARTAN and BARAI, who was pregnant, did not go to work during the day. PERSON THREE fed the child, but the parents stayed with the child

16

during the day. PERSON THREE was overwhelmed with the amount of work she had to do. According to PERSON THREE, there was also another male living at the residence. PERSON THREE worked for KARTAN for three days; on the fourth day, she was picked up and brought to Woodland, California.

52.     PERSON THREE spoke to KARTAN in the Hindi language and acknowledged that she could understand him. PERSON THREE did not know the wife's name. The wife (BARAI) was always irritated and ordered her around. On one occasion, BARAI requested that PERSON THREE make tortillas at midnight. BARAI called PERSON THREE names and said PERSON THREE was a liar.

53.     PERSON THREE did not go outside and said she did not know how to open the door. PERSON THREE did not have time to look around because KARTAN kept her very busy working either upstairs or in the kitchen.

54.     Because KARTAN and BARAI were in the house all day, PERSON THREE had to cook for them as well. PERSON THREE ate whatever leftovers were available. She was not allowed to eat at the same time as the family.

55.     KARTAN would take a whole chicken from the freezer and, in order to defrost it, he took a plastic bowl, filled it with water and heated the water in the microwave. The chicken was placed in the water to help it thaw. PERSON THREE did not want to cut the chicken, but KARTAN forced her to cut it using a dull knife. She asked to use a sharp knife, but KARTAN said she had to use the dull one. PERSON THREE cooked the chicken on the gas stove using a large pot.

56.     PERSON THREE was responsible for feeding the child and was required to prepare five specific foods for the child, including eggs and potatoes. KARTAN asked her to

grate the food, including the potatoes. She used a cloth to protect her hands when handling hot food.

57.    During the three days she worked for KARTAN, PERSON THREE was able to maintain possession of her phone and always kept it in her pocket. She was afraid he would try to take it from her. PERSON THREE tried calling her friend to come pick her up, but KARTAN did not allow her to leave and refused to provide her friend with the address of the KARTAN residence. PERSON THREE said she was sick and had to go, but KARTAN refused to let her leave. KARTAN and his wife threatened PERSON THREE and said they would call the police if she tried to leave. PERSON THREE was not sure what the police would do, but she was afraid of them. Both KARTAN and BARAI called her derogatory names including "liar," "scoundrel," and "bitch."

58.    On the day PERSON THREE left, KARTAN was very angry with her and did not show her the door/path to leave the house. PERSON THREE asked KARTAN's brother, Sudheer Kartan, for the gate code, but he did not have it.

59.    A person from PERSON THREE's village in Nepal, named "SUM," located the house and picked her up. As PERSON THREE was leaving, she asked KARTAN for money for the work she had performed. At that time, BARAI told KARTAN to call the police.

60.    KARTAN told PERSON THREE not to say anything to anyone (referring to the person who would replace her) about what happened.

### Review of Emails

61.    On March 2, 2016, law enforcement obtained search warrants for Google, Inc. and Yahoo! for the email accounts sharmistha.barai@gmail.com and sqlforlife@yahoo.com. At

18

the end of March and beginning of April 2016, I received the above-mentioned search warrant results from Google, Inc. and Yahoo!

     62.     On April 8, and April 25, 2016, while reviewing KARTAN's email account, sqlforlife@yahoo.com, I found information related to PERSON ONE and three other Indian females (hereinafter "PERSON FOUR," "PERSON FIVE" and "PERSON SIX") indicating they had all traveled to the United States from India to work as nannies for KARTAN and BARAI. Following is a summary of this information:

       a.  PERSON FOUR

           i.  In one email, PERSON FOUR sent KARTAN a scanned copy of the first and last page of her Republic of India passport, which contained all of her biographical information. PERSON FOUR also sent KARTAN a photograph of herself. In another document contained in KARTAN's emails, there is a flight itinerary for PERSON FOUR. The itinerary indicated that PERSON FOUR was scheduled to fly from Hyderabad, India to Abu Dhabi on September 27, 2015, and then to San Francisco on September 28, 2015. The itinerary reflected that PERSON FOUR was scheduled to depart the United States on March 19, 2016, from San Francisco to Abu Dhabi to Hyderabad on March 20, 2016.

          ii.  A law enforcement database query in the Treasury Enforcement Communication System ("TECS") indicated that PERSON FOUR traveled to the United States from Qatar on January 29, 2015, to the Miami International Airport. Indices reflect that PERSON

19

FOUR was admitted into the United States as a B-2 visitor for pleasure, until July 28, 2015. PERSON FOUR listed an address of 2601 S Course Drive in Pompano Beach, Florida, on her I-94 (Arrival/Departure Card). TECS reflects a departure for PERSON FOUR on July 16, 2015, from the United States, through the Miami, Florida, International Airport to Qatar.

    iii. TECS indicated PERSON FOUR traveled from Abu Dhabi to San Francisco, California, on September 27, 2015. Upon PERSON FOUR's arrival to San Francisco, Customs and Border Protection ("CBP") referred PERSON 4 to the secondary inspection area. A CBP Officer reported that PERSON FOUR "Stayed 6 months/is back again 2 months later requesting 6 months again…" After further inspection, another CBP Officer reported, "…Subject family was contacted in the United States. Subject will here for two months. Admitted B2." PERSON FOUR listed an address of 1102 S Abel Street in Milpitas, California, on her I-94. TECS indicated PERSON FOUR departed the United States from the San Francisco International Airport, to Abu Dhabi on October 7, 2015. TECS records reflect that PERSON FOUR remained in the United States for approximately eleven (11) days.

  b. PERSON FIVE:

    i. Your Affiant discovered two emails that reflected the communication between PERSON FIVE and KARTAN. The first

email, dated June 11, 2015, stated, "Dear Sir, Kindly find this attachment of the Nanny (Sri ▮▮▮▮) Visa details kindly check those and let us know..we are eagerly waiting for your call.  Name: [PERSON FIVE] Contact: 995▮▮▮▮ & 910▮▮▮▮…"

KARTAN forwarded the above email to his Satish.kartan@fisglobal.com email account on June 12, 2015.  The second email, dated June 22, 2015, read, "Hi Satish, Can you please the tickets so that I can be sure of my travel dates. Could you please mail me ur complete name n address as I have to fill your details at the immigration I also need your invitation.  Thanks & Regards, ▮▮▮▮."

ii.  Also found in KARTAN's emails were scanned copies of the first and last page of a Republic of India passport in the name of PERSON FIVE.  KARTAN's emails also contained a scanned copy of PERSON FIVE's B1/B2 visa and a four-page flight itinerary from Travelocity.  According to the itinerary, PERSON FIVE was scheduled to fly from Hyderabad to Dubai on July 3, 2015, then into the United States through Atlanta.  The itinerary reflected that PERSON FIVE would transit from Atlanta to Sacramento, CA, on July 4, 2015.  The itinerary reflected a return flight was scheduled for December 28, 2015, from Sacramento to Minneapolis to Amsterdam to Delhi to Hyderabad, arriving in Hyderabad on December 30, 2015.

iii. TECS records indicated that PERSON FIVE arrived into the United States on July 4, 2015, and was referred to CBP secondary for additional inspection. Inspection Results revealed that a CBP Officer referred PERSON FIVE to secondary and stated the following in a report: "YEL/PAX coming to help/work with a old lady who claims is a family friend/unemployed and pax didnt pay ticket/5 months." A CBP Secondary Officer admitted PERSON FIVE into the United States and wrote the following comments in the inspection results: "Subject coming to visit family friends and family in Stockton, CA. provided addresses and contact information for family in addition to friend she's staying with. Previously employed by Novartis and is now a teacher. Says she took a year leave and will return to teaching next academic year in June. Story told matches information found even down to purchase date of ticket. Nothing found to show subject had intent to violate visa. Admitted B2." PERSON FIVE listed an address of 6541 Brook Hollow Circle, Stockton, California on her I-94 – CBP Arrival/Departure Record. TECS records reported that PERSON FIVE left the United States from Los Angeles on August 5, 2015, approximately one month after arriving.

c. PERSON SIX:

i. Two emails reflected communication between PERSON SIX and KARTAN, dated October 19 and 22, 2015. The October 19, 2015 email read, "Hi, Just wanted to check if this position is still open I

22

am a teacher by profession and do not have any experience as a
nanny. However, I do have 2 children aged 6 & 13 respectively.
Please let me know if you are still interested, I would send you my
Resume. Please note – I have B1 visa for 10 years." The second
letter read in part, "Hi, Sending you my Resume and scanned
copies of passport. Please can you give me sum (sic) more time
please? Another 1 week? I have to some personal work to take
care. Many Thanks."

    ii. Also located with KARTAN's emails were scanned photocopies of
the front and back pages of PERSON 4's Republic of India
passport. PERSON SIX's B1/B2 visa was issued in Hyderabad on
May 18, 2015, and expires on May 14, 2025.

    iii. A query of TECS indicated that PERSON SIX was issued a B1/B2
visa on May 18, 2015, valid for ten years.

    iv. TECS indicated PERSON SIX entered the United States on
October 29, 2015, into Los Angeles aboard a flight from Paris and
departed the United States on January 9, 2016.

    v. PERSON SIX was again admitted into the United States until April
28, 2016, and listed an address of Brook Hollow Circle 6,
Stockton, California on her I-94 – Arrival/Departure Card.

d. <u>PERSON ONE</u> (previously identified victim):

    i. Two emails were written to KARTAN concerning PERSON ONE:
The first email was from PERSON ONE's husband, and the
second email was from PERSON ONE. The first email, from

23

PERSON ONE's husband to KARTAN, dated August 22, 2015, stated, "Sir, This is ███ from Hyderabad [PERSON ONE]'s Husband sending the documents the passport photo copies & family photo for your perusal. I am giving 2 references for you to confirm [PERSON ONE's] husband lists two reference names, addresses in India, and phone numbers that are not included in this Affidavit). Please call them during night hours after 8:00 pm as per Indian Time. Please do not disclose the nature of job. Thanks." There were four attachments included on that email. The second email, from PERSON ONE to KARTAN, was dated October 23, 2015, that stated, "Sir, This is [PERSON 1ONE from Hyderabad, we had seen ur advertisement so in connection I would like to inform u that due to financial crisis I am in need of job, and our h." The emails sent to KARTAN included scanned copies of the first and last pages of the Republic of India passports of PERSON ONE and PERSON ONE's husband, which included their photographs, dates of birth, signatures, and photographs of them and their son.

ii. Also discovered in KARTAN's emails was a flight travel itinerary for PERSON ONE, who was scheduled to fly from Hyderabad to Mumbai, India, on January 7, 2016, to London to Dallas, Texas. The itinerary reflected that PERSON ONE was scheduled to travel from Dallas, Texas, to Sacramento, arriving on January 8, 2016.

63.    My review of the email account sharmistha.barai@gmail.com included the

following exchanges:

      a.   An email from sqlforlife@yahoo.com to sharmistha.barai@gmail.com
           dated April 12, 2016 that includes a flight itinerary for an adult Indian
           female.  The email includes a message from the Indian female stating, "Hi
           Satish, Could you please call me back.  I didn't think we had confirmed
           my duties.  Regards, ▇▇▇.

      b.   An email from sharmistha.barai@gmail.com to skartan@gmail.com dated
           May 5, 2016, stating

           i.   "1. Our Baby is top priority and we expect the Nanny keep a close
                watch on the baby at all times.  Also, Nanny should strive to
                interact with the baby in a fun and educational way to help with the
                growing brain of the baby.  Nanny should talk and play with the
                baby all the time and describe things as the baby plays – that is
                how they learn language. Sometimes it takes 2 hours to feed the
                baby.  Nanny has to be patient."

           ii.   "2. Mostly, Nanny should be available from 7AM to 11PM.
                However, since children are unpredictable, sometimes, it can be as
                early as 6AM and and [sic] as late as 1AM. We will not disturb the
                Nanny during the night before 6AM. We will take care of the baby
                during the night even if she wakes up"

           iii.   "3. Nanny should own the kitchen and should take care of
                household cooking, cleaning, etc."

    iv.  "4. We expect the Nanny to vacuum the carpet once a week. Also, there will be laundry to do once a week."

    v.  "5. We eat very healthy food. We eat brown rice only and we don't use oil at all (oil does not add taste to curries, even though everybody misconstrues it)"

c.  An email from sharmistha.barai@gmail.com dated November 2, 2013 to admin@nanny-agency.com with the subject heading: "Re: nanny-agency.com registration."  The email includes the following statement: "Hi, I am not being able to log in with the stated ID and password. I will appreciate if you provide me with a correct ID. Also, I would like to add to my profile that in addition to English I speak Bengali and my husband speaks Telugu. Thank you, Sharmistha."

d.  An email from sharmistha.barai@gmail.com to sqlforlife@yahoo.com dated January 28, 2016 that includes the subject heading: "Fwd: Will pay $2000 per month for a female Nanny."  The contents of the email refers to a Nepalese woman from the Sacramento area who is seeking employment as a nanny.

**Additional Investigation**

64.    On or about April 11, 2016, a confidential informant ("CI") placed a recorded telephone call to KARTAN using the ruse that the CI was interested in working as a nanny for KARTAN and BARAI.  During the call, which lasted approximately 17 minutes, KARTAN described the nature of the work, which included working seven days per week from 6 a.m. to midnight each day.  The CI explains that her visa had expired and that, because of her unlawful

status, her current employer no longer wanted to employ her. Despite knowing the CI's unlawful status, KARTAN continued to discuss the nanny position by requesting that the CI send him several references and a copy of her passport.

65.     On or about September 9, 2016, law enforcement executed a search warrant at the KARTAN residence. Agents seized numerous items that corroborated the accounts of PERSON ONE and PERSON TWO, including lists of chores, graters, strainers and other cooking utensils, grates from a gas stove, a coded lock on a side gate, an alarm clock from the guest bedroom, and photographs showing the locations of various cooking and cleaning items throughout the house. Agents also seized several digital devices, including KARTAN's cell phone. Agents did not locate a deadbolt affixed to the outside of the front door.

66.     Upon subsequent review of KARTAN's cell phone, agents discovered numerous chat messages, many of which used the WhatsApp messenger service application, which allows users to send and receive text messages, photos, and other digital media. Dozens of these chats appear to relate to the recruitment and hiring of nannies or domestic help whether domestically or from overseas. I located one chat exchange in which KARTAN communicated with someone who appeared to be assisting in recruiting nannies for the purpose of employment at the KARTAN residence. The following text messages are portions of that exchange, which occurred on or about September 1 and 2, 2016:

> KARTAN: We need somebody now. My wife is due any day now
>
> KARTAN: She can't cook or anything
>
> KARTAN: So need somebody soon, can u help?
>
> OTHER PERSON: I'm sorry I had asked so many people but they are scared to come to your house because of the work.

OTHER PERSON: Still wait there is one lady in new York I'll ask her .

KARTAN: Ok

OTHER PERSON: And there is one in India I'll ask her if she wants to come .

OTHER PERSON: You have so many conditions and the work and the timings are too much .

OTHER PERSON: Here they are paying me one lakh rupees and they purchased my ticket to and fo .

OTHER PERSON: And I'm very happy not much work only one boy to take care of and cook twice a week .

OTHER PERSON: And he goes to school from morning to evening .

OTHER PERSON: They have one person who comes and cleans the house twice a month .

OTHER PERSON: This is how the house should be .

OTHER PERSON: You my God .

KARTAN: Did u ask the woman from India?

OTHER PERSON: Yes I asked her but she knows you so she does not want to come.

KARTAN: I did not know I am so famous.

OTHER PERSON: Why are all the people talking about you and are scared of you .

OTHER PERSON: did any lady with the name of Nancy work with you .

OTHER PERSON: From new York .

28

KARTAN: No.

KARTAN: Only Indians worked for us and they had Indian named

KARTAN: Names

KARTAN: R they mistaking me for somebody else?

67.     In another text conversation that occurred between June 1 and July 7, 2016, KARTAN engaged in text messaging with a woman who appears to be the daughter of a woman employed as a nanny in the KARTAN residence. In this text exchange, the daughter implores KARTAN to allow her mother to stop working. The daughter explains that her mother's situation "is very bad….She is all the time weeping…And scare about her situvation [sic]." At one point, the daughter threatens to contact the police if KARTAN does not allow her mother to leave. Law enforcement continues to investigate the context and persons involved in that text conversation.

68.     A review of KARTAN's cell phone also revealed numerous text messages between KARTAN and BARAI, some of which referred to the presence of a nanny at the KARTAN residence. In one text message dated July 20, 2016, BARAI requests KARTAN to "[t]ell Rao about this woman showing attitude." Based on the investigation to date, I believe that "Rao" refers to a recruiter located in India with whom PERSON TWO had contact (see Paragraph 28 above).

69.     During my review of KARTAN's cell phone and the email accounts sharmistha.barai@gmail.com and sqlforlife@yahoo.com, I discovered numerous communications from December 2015 to June 2016 between KARTAN and BARAI indicative of marital strife. The bulk of these communications reflect angry statements from BARAI toward KARTAN. One exchange from May 30, 2016 included the following excerpt:

29

BARAI: Kutta. God gives me death so that I never see you ever again

BARAI: Why don't you drive in the highway and sleep

KARTAN: Get a hold on emotions, yes or no?

KARTAN: That's a good idea but I am already in the hotel room

BARAI: Kutta. Never call me or text me again

KARTAN: No? Ok fine

BARAI: If you come in the morning, I will leave the house. I will get into accident if you treat me like a stupid and talk as if everything is fine

BARAI: This is the end

KARTAN: Do u want me to come now?

BARAI: God kills you, that's what I want. That will be a good present for that bitch too

KARTAN: Everything heals over a few hours of separation baby

KARTAN: Craziness also lowers and sanity returns

BARAI: Satish, you are a bastard

KARTAN: Introspection blossoms too

KARTAN: Do you want me to come now?

KARTAN: Don't text me after I sleep, I am very sleepy

BARAI: If you think everything will be normal tomorrow, then you will see either you or I will only live

BARAI: You bastard

KARTAN: Do u want me to come now?

KARTAN: Simple question yes or no

BARAI: you haramee. My daughter also hates you. I want, she never sees you again

KARTAN: No. ok, goodnight

BARAI: Your whole family dies

70.     In another exchange, BARAI accuses KARTAN of physical abuse. In an email to family members dated December 30, 2015, BARAI states, "Satish pushed me like a maniac while I was holding my daughter. While falling, I just wanted to save my daughter's head. I thought I would die. I had dark bruise all over my lower back and pain for 2 weeks." BARAI further states, "Many times, I was scared of his threats of killing me."

71.     On September 9, and September 15, 2016, law enforcement agents spoke with an approximately 50-year-old male neighbor of KARTAN (hereinafter "WITNESS ONE"). WITNESS ONE stated that sometime in 2015, a woman (hereinafter "PERSON SEVEN") approached his home and complained about the poor treatment she was suffering at the KARTAN residence. According to WITNESS ONE, PERSON SEVEN stated she was not given enough food to eat and, on one occasion, KARTAN pulled her down some stairs. PERSON SEVEN eventually left the home of WITNESS ONE and returned to the KARTAN residence.

72.     On several occasions afterward, WITNESS ONE's wife left food out on their doorstep. When PERSON SEVEN had the opportunity, she would briefly leave the KARTAN residence to retrieve the food, and then quickly return.

73.     After several days, PERSON SEVEN permanently left the KARTAN residence and asked to stay with the family of WITNESS ONE. PERSON SEVEN did not want KARTAN to know she was staying with the family of WITNESS ONE. On one occasion, PERSON SEVEN accompanied WITNESS ONE to a family gathering in the San Francisco Bay Area. Upon their return, they noticed KARTAN standing in front of his residence. When WITNESS ONE and PERSON SEVEN drove past KARTAN in their vehicle, PERSON SEVEN ducked down to avoid being seen by KARTAN.

74.     PERSON SEVEN stayed approximately one week with the family of WITNESS ONE and then returned to India.

75.     On another occasion in late 2015 or early 2016, another woman approached the mother of WITNESS ONE and asked for help. The woman, identified by WITNESS ONE as PERSON FOUR (discussed above), was crying and asked WITNESS ONE's mother for help (WITNESS ONE's mother lived in WITNESS ONE's home). PERSON FOUR stated that she no longer wanted to work at the KARTAN residence.

76.     One evening several days later, WITNESS ONE observed PERSON FOUR standing near the front gate of the gated community where WITNESS ONE resides. PERSON FOUR was wearing pajamas and was standing with her luggage. Because PERSON FOUR appeared lost, WITNESS ONE brought PERSON FOUR back to his home so that she could telephone family members for assistance. Several hours later, a relative of PERSON FOUR arrived and picked up PERSON FOUR.

77.     The day following PERSON FOUR's departure, KARTAN approached WITNESS ONE and requested that WITNESS ONE stop "bad-mouthing" KARTAN and BARAI. WITNESS ONE told KARTAN that what he (KARTAN) was doing was wrong. KARTAN responded that WITNESS ONE should mind his own business.

78.     On or about September 9 and September 22, 2016, law enforcement spoke with another male witness (hereinafter "WITNESS TWO"). WITNESS TWO stated that on or about August 31, 2016, PERSON TWO (discussed above) came to his door seeking help. According to WITNESS TWO, PERSON TWO did not speak English and appeared scared. WITNESS TWO brought PERSON TWO into his home and tried to communicate with her. PERSON TWO showed WITNESS TWO a piece of paper containing the address "6541 Brook Hollow

32

Circle," which is the KARTAN residence. WITNESS TWO stated that PERSON TWO kept showing and moving her hands in a manner that indicated her hands had been burned. PERSON TWO appeared hungry so WITNESS TWO provided her with food.

79. During the encounter described above, WITNESS TWO observed PERSON TWO crying. WITNESS TWO was able to figure out that PERSON TWO was afraid of her boss. WITNESS TWO later called police, who recovered and removed PERSON TWO.

80. WITNESS TWO further stated that on several occasions, he has observed taxis or "Uber" drivers dropping off women at the KARTAN residence.

## Other Records

81. During the course of the investigation, records of the California Employment Development Department ("EDD") were subpoenaed relative to KARTAN and BARAI. EDD indicated that it had no household payroll- or wage-related records for KARTAN or BARAI. From this response, and consistent with the statements of PERSON ONE, PERSON TWO, and PERSON THREE that they were not paid wages while working at the KARTAN residence, I deduce that KARTAN and BARAI did not report paying any wages to persons working in their home as domestic help or nannies.

82. During the course of the investigation, I have reviewed numerous advertisements for nannies and/or domestic help posted online at the website Pragathi.com, which, among other things, serves as an "Indian portal" that allows the posting of classified advertisements. Based on the investigation to date, I believe that between as early as April 2014, and September 2016, KARTAN and BARAI used the Pragathi.com website to recruit nannies and domestic workers to work in their homes in both Albuquerque, New Mexico, and Stockton, California. Two examples of such advertisements are described below.

33

83.    An advertisement dated May 25, 2014 stated the following:

> We are looking for a live in nanny who can help us with our one year old
> baby, cooking and household work. We live in Albuquerque, New
> Mexico. We are very happy to provide a ticket for the flight. We provide
> a separate room in addition to a good salary. If you are interested, for
> details please contact me at sharmistha.barai@gmail.com or call me
> (Sharmistha) at 630-3387163 my husband (Satish) at 312-446-6454. Even
> if you are unavailable, if you can refer us to somebody who can join our
> family as a Nanny, we will appreciate the help. Thank you very much!

84.    As another example, on or about September 1, 2016, an advertisement was placed
on Pragathi.com, noting a city of Stockton, California 95219, and stating: "Nanny needed
immediately in California, USA. We will pay $2000 per month. Call (224) 678 5472 or E-mail
SQLFORLIFE@YAHOO.COM. Folks from India are welcome to apply if you have a valid
visa."

## CONCLUSION

85.    Based upon the facts set forth in this affidavit, I submit there is probable cause to
believe that Satish KARTAN and Sharmistha BARAI have committed a violation of Title 18,
United States Code, Section 371 in that they conspired to commit the following federal offenses:
Title 18, United States Code, Section 1589(a) – forced labor; Title 18, United States Code,
Section 1351(a) – fraud in foreign labor contracting; and Title 29, United States Code, Sections
206(a)(1)(C), (f)(1), 215(a)(2) and 216(a) – violations of the Fair Labor Standards Act. I further
submit that there is probable cause to believe that Satish KARTAN and Sharmistha BARAI have
committed violations of Title 18, United States Code, Section 1589(a) (forced labor).

34

86.     I respectfully request that a criminal complaint be issued and that arrest warrants

for Satish KARTAN and Sharmistha BARAI also be issued.

I declare under penalty of perjury that the statements above are true and correct to the

best of my knowledge and belief.

Respectfully submitted,

Special Agent Marc T. Beeson
Homeland Security Investigations

Subscribed and sworn to before me on this $\underline{21}$ day of October, 2016.

HONORABLE KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Approved as to Form:

Josh Franklin Sigal
Special Assistant U.S. Attorney

35